**James WEBSTER, Plaintiff,**

v.

**Brian FISCHER, Commissioner New York State Department of Correctional Services, et al., Defendants.**

**No. 9:08–CV–0071 (LEK/DEP).**

United States District Court, N.D. New York.

March 9, 2010.

James Webster, Rome, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Christina Roberts–Ryba, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report–Recommendation filed on February 22, 2010 by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report–Rec. (Dkt. No. 58). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including Plaintiff James Webster's Objections, (Dkt. No. 14) ("Plaintiff's Objections"), which were filed on March 2, 2010, and Defendants R. Chapin, R. Clink, Michael Corcoran, A. Costello, Brian Fischer, Halcott, Hoadley, Michael Maher, and Tom Napoli's Letter Brief in Support of the Report and Recommendations (Dkt. No. 60), which were filed on March 4, 2010.

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* Where, however, an objecting " 'party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.' " *Farid v.*

*Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y. 2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007) (citations and quotations omitted)).

This Court has considered the Plaintiff's Objections and has found that they simply reiterate the arguments made in his Complaint (Dkt. No. 1). Plaintiff does not object to any particular finding by the Magistrate, but rather, claims that "the Report Recommendation has no merit because it solely relies on defendants word and not the documented truth of plaintiff." Plaintiff's Objections at 6. Accordingly, the Court has reviewed the Magistrate's findings for clear error. Having discovered no such error, the Court has determined that the Report–Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 58) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion for summary judgment (Dkt. No. 44) is **GRANTED,** and that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION *

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff James Webster, a prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, *inter alia,* complaining of civil rights violations allegedly occurring while he was confined at the Cayuga Correctional Facility ("Cayuga"), a prison operated by the New York State Department of Correctional Services ("DOCS"). The plaintiff's complaint centers upon a series of events which he attributes to retaliatory motives on the part of prison officials at Cayuga allegedly resulting from his involvement in the facility's Inmate Liaison Committee ("ILC"). The plaintiff asserts that he suffered discrimination, retaliation, and harassment because of complaints he made regarding prison conditions while on the ILC and alleges violations of various constitutional rights, federal statutes, state law, and DOCS regulations. To redress the alleged violations, the plaintiff seeks a declaratory judgment and injunctive relief, as well as money damages in the amount of $500,000.

Presently before the court is defendants' motion for summary judgment seeking dismissal of the plaintiff's claims. In their motion, defendants argue that plaintiff's claims should be dismissed for failure to state and support viable causes of action and, as to several of the named defendants, due to lack of their personal involvement in the alleged constitutional violations.

Having carefully considered the record now before the court I recommend that defendants' motion, in response to which plaintiff has offered only modest opposition, be granted and his complaint be dismissed in its entirety.

## I. *BACKGROUND*[1]

At all times relevant to the complaint, the plaintiff was a prison inmate entrusted

---

\* Editor's Note: Attachments of Westlaw case copies deleted for online display.

1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

to the custody of the DOCS and confined at Cayuga. Complaint (Dkt. No. 1) ¶¶ 1, 11. The actions giving rise to plaintiffs' claims began at or around the time of his transfer into an Alcohol and Substance Abuse Treatment ("ASAT") dormitory at the facility, known as the F–2 unit, in December of 2005.[2] *Id.* ¶¶ 11–12.

Among the corrections officers assigned to work in the F–2 unit at the relevant times was defendant Robert Clink. Clink Decl. (Dkt. No. 44–13) ¶ 3. According to defendant Clink, who was on vacation at the time that plaintiff entered the unit, his philosophy is that applicable prison rules should be strictly enforced, particularly given that the unit houses inmates with histories of substance or alcohol abuse. *Id.*

When inspecting the unit upon his return from vacation, defendant Clink observed that Webster's living area did not comply with ASAT cube standards; as a result of his finding, Corrections Officer Clink left a written warning for Webster. *See* Clink Decl. (Dkt. No. 44–13) Exh. A (Memorandum dated January 1, 2006). Later that day, plaintiff approached Clink to discuss the written warning. Even though plaintiff had received and signed for an ASAT program manual when entering the unit (which included within it the governing standards for maintaining a cube), Clink took the time to explain the ASAT standards to him. *Id.* at ¶ 10 and Exh. A. Webster had apparently also received prior written warnings of cube standards violations on December 13 and 27, 2005, before Clink returned from vacation, and he subsequently received two more, on January 12 and 30, 2006, the latter two of which resulted in the issuance of misbehavior reports to plaintiff. *Id.*

According to plaintiff, his difficulties with Corrections Officer Clink began when Clink learned that Webster was running for the position of dormitory representative to the ILC. Webster Tr. (Dkt. No. 44–2) pp. 55–56. Plaintiff overheard a conversation in which one of the inmates in the unit informed Corrections Officer Clink of this fact, to which Clink replied that "ILC guys don't last long over here." *Id.* at p. 56. Thereafter, every time Clink issued Webster a misbehavior report he would make a negative comment about the fact that he was on the ILC. *Id.* at pp. 62–64.

Plaintiff began lodging complaints against Corrections Officer Clink on January 30, 2006. *See* Roberts–Ryba Aff. (Dkt. No. 44–4) Exh. A pp. 30–36 (unnumbered). On that date, as well as again on February 10 and February 16, 2006, plaintiff wrote letters to the superintendent of the facility, with copies to the DOCS Inspector General, alleging that Corrections Officer Clink was harassing him as a result of Webster's position with the ILC and also claiming that the cube violations charged and subsequent misbehavior reports issued by defendant Clink were retaliatory. *See id.* Corrections Officer Clink responded in writing to each denying any harassment, or that his actions were in any way motivated by Webster's position on the ILC. *See* Clink Decl. (Dkt. No. 44–13) Exh. A. In his written response, Corrections Officer Clink offered his view that plaintiff's problems stemmed from his inability to deal with the strict enforcement of the rules in the ASAT unit. *See id.*

Plaintiff's complaints regarding Corrections Officer Clink's alleged harassment and retaliation were investigated by Corrections Captain R. Chapin, another named defendant in the action, who inter-

---

2. The F–2 unit is comprised of "cubes" in which approximately sixty inmates are housed. *See* Transcript of Plaintiff's Deposi-

tion ("Webster Tr.") (Dkt. No. 44–2) p. 53; *see also* Clink Decl. (Dkt. No. 44–13) ¶ 3.

viewed plaintiff on more than one occasion; the findings resulting from defendant Chapin's investigation are memorialized in a memorandum prepared by him on March 2, 2006. Roberts–Ryba Aff. (Dkt. 44–4) Exh. A p. 42 (unnumbered). In it Captain Chapin reported that during a meeting on March 1, 2006 Webster advised that his relationship with Corrections Officer Clink was good and that there were no further problems.[3] *See id.* Chapin also noted that plaintiff declined to identify witnesses to the alleged harassment and that he requested Webster to forward any future security concerns to him. *See id.* In his report defendant Chapin concluded that there was no evidence of harassment and that it was his "strong opinion that Webster is having difficultly with the ASAT program." *Id.*

On February 10, 2006, after reporting to Corrections Officer Clink that he was going to Jumah services, by his own later admission plaintiff instead went to an ILC meeting at the commissary. *Id.* When Corrections Officer Clink called to confirm that plaintiff was present at the Jumah services, he learned that Webster was not. *Id.* Clink subsequently questioned Webster who lied and said that he had been called out of Jumah services for an ILC meeting when he had not attended religious services at all. *Id.* As a result, Corrections Officer Clink issued Webster another misbehavior report on February 10, 2006, charging plaintiff with making false state-

ments, being out of place in the facility, and failing to follow facility regulations, all in violation of prison rules. Clink Decl. (Dkt. No. 44–13) Exh. B.

Plaintiff was afforded a Tier II disciplinary hearing, held on February 17, 2006, with respect to these charges.[4] Clink Decl. (Dkt. No. 44–13) Exh. C. Although the charge of making false statements was dismissed, at the close of the hearing, in light of his admission that he had signed up for Jumah services but had instead gone to the commissary for an ILC meeting Webster was found guilty of being out of place and of a movement violation; as a result, he was sentenced to a loss of recreation, microwave, and telephone privileges for a period of fifteen days. *Id.* at pp. 4–5, 15. Plaintiff did not appeal this disciplinary determination.

The February 17, 2006 disciplinary proceeding was followed by another occurring approximately two months later due to plaintiff's repeated failure to comply with a written medical restriction. On April 12, 2006, a member of the health services staff at Cayuga issued a medical restriction excusing Webster from all programs, including his position as a school porter, ASAT, and recreation, expressly stating that "inmate must remain in housing unit-may watch TV" until April 26, 2006. *See* Roberts–Ryba Aff. (Dkt. No. 44–4) Exh. A at p. 45 (unnumbered). Copies of the medical excuse, which was signed by the plaintiff and a registered nurse at the facility,

---

**3.** Defendant Chapin's memorandum of March 2, 2006, as well as the declaration of Michael P. Corcoran, *see* Corcoran Decl. (Dkt. No. 44–9) ¶ 20, also reference a letter of complaint dated February 22, 2006 from plaintiff to former DOCS Commissioner Goord. That letter, however, is not included in the record, and although the Corcoran declaration refers to several exhibits, none were attached to the copy of his declaration filed with the court.

**4.** The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings ad-

dress the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

were provided to prison officials stationed at the F–2 unit, the program committee, the work area, and plaintiff. *See id.*

Despite this limitation on plaintiff's activities, Webster apparently continued to attended programs and activities. As a result, on April 14, 2006 plaintiff was issued three separate misbehavior reports from three different corrections officers, all relating to violation of the medical restriction. The first of those disciplinary charges occurred at 8:20 a.m. on that day when Webster approached Corrections Officer Clink's desk and stated that he was going to the facility gym to conduct ILC business. Clink Decl. (Dkt. No. 44–13) ¶¶ 15–17 and Exh. F. Clink informed Webster that he could not do so because of his medical restriction, and Webster became loud and argumentative, stating to Clink, "I'm going to write you up." *Id.* As a result of the incident, Corrections Officer Clink issued plaintiff a misbehavior report for conduct disturbing order at the facility and harassing a corrections employee. *Id.* Later that same day, at approximately 6:35 p.m., plaintiff received a second misbehavior report from Corrections Officer Smith, accusing him of disobeying a direct order and being out of place, again due to the fact that he left his dorm notwithstanding his medical restriction. Hoadley Decl. (Dkt. No. 44–11) ¶ 15.

Shortly thereafter Sergeant Hoadley, who is the ILC staff advisor, attended an ILC meeting being held in the facility library and found plaintiff also in attendance, despite the medical restriction and the misbehavior reports issued to him earlier that day. *Id.* at ¶¶ 11–12. Based upon that unauthorized attendance at the ILC meeting, defendant Hoadley issued plaintiff his third misbehavior report of the day, and his second for being out of place in violation of prison rule 109.10. *Id.*

A Tier II disciplinary hearing was conducted on April 18 and 19, 2006 in connection with all three misbehavior reports. *See* Hoadley Decl. (Dkt. No. 44–11) Exh. C. At the hearing the charges were read to plaintiff, and, after his understanding of them was confirmed, plaintiff denied all of the charges lodged against him. Clink Decl. (Dkt. No. 44–13) ¶ 19 and Exh. G. The evidentiary portion of the hearing proceeded, and Webster was permitted to call witnesses on his own behalf. *Id.* At the close of the proceedings the hearing officer dismissed the charges contained in the misbehavior report issued by Corrections Officer Smith as redundant to that issued by defendant Hoadley, but found plaintiff guilty of all other charges and sentenced him to thirty days of keeplock confinement with a concomitant loss of recreation, microwave, telephone, package, and commissary privileges.[5] *Id.*, Exh. G at p. 28 and Exh. H. Plaintiff appealed the hearing officer's decision to defendant Michael Cor-

---

**5.** Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir. 1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams, and counseling, and can have cell study, books, and periodicals. *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs and are usually allowed less time out of their cells on the weekends. *Id.*

coran, the Superintendent at Cayuga, who affirmed that determination. Hoadley Decl. (Dkt. No. 44–11) Exh. D.

Plaintiff claims that he discussed his complaints regarding Corrections Officer Clink's harassment with defendant Hoadley and that in response Hoadley informed plaintiff that Clink did not like ILC members in his dorm. Webster Tr. (Dkt. No. 44–2) p. 109. According to plaintiff, he responded by telling defendant Hoadley that he did not want any trouble and asked Hoadley to speak with Clink on his behalf. *Id.* Plaintiff also claims that he complained to Hoadley that after certain changes to ASAT rules were made by the administration, Corrections Officer Clink nonetheless refused to acknowledge the changes.[6] *Id.* at p. 111.

Plaintiff complains that defendant Hoadley, like Clink, harassed and threatened him. Plaintiff alleges that on September 24, 2006, as he was exiting the law library, Hoadley confiscated a legal folder from him. Webster Tr. (Dkt. No. 44–2) pp. 120–21, 128–30. When Hoadley took the folder, Webster's legal papers fell on the floor, and some went into a vent and were lost. *Id.* at p. 132. Plaintiff alleges that he filed a grievance regarding the incident and because of this was later threatened by Hoadley to "watch his back." [7] *Id.* at p. 135.

Hoadley denies harassing or retaliating against plaintiff and maintains that he was unaware of any complaints by the plaintiff regarding Corrections Officer Clink, that he was not Clink's supervisor, and that he did not even work the same shift as Clink. Hoadley Decl. (Dkt. No. 44–11) ¶ 7. While Hoadley acknowledges having taken plaintiff's folder, he asserts that the folder in Webster's possession was for ILC members only and that in September of 2006 plaintiff was no longer a member of the ILC.[8] *Id.* at ¶ 20.

On February 7, 2007, plaintiff filed a written grievance claiming that Sergeant Hoadley was harassing him in retaliation for his activities on the ILC and that Hoadley had instructed him that all ILC correspondence must be reviewed and approved by Hoadley in advance; plaintiff's grievance requested that Hoadley be removed from the ILC advisor position due to a conflict of interest.[9] Roberts–Ryba Aff. (Dkt. No. 44–4) Exh. A p. 14 (unnumbered); Hoadley Decl. (Dkt. No. 44–11) ¶ 22. At the direction of the Superintendent Corcoran, an investigation of plaintiff's grievance was conducted.[10] *See* Hoadley Decl. (Dkt. No. 44–11) Exh. E.

---

**6.** It is not clear from the record before the court when plaintiff is alleged to have made these complaints to Hoadley.

**7.** There is no written grievance dated September 24, 2006 contained in the record.

**8.** The statement that plaintiff was no longer a member of the ILC in September of 2006 appears to be inconsistent with other evidence in the record suggesting that plaintiff remained on the ILC, and served as its chair, until May 2, 2007. *See, e.g.* Hoadley Decl. (Dkt. No. 44–11) Exh. F and Corcoran Decl. (Dkt. No. 44–9) ¶ 29. This fact issue is not outcome determinative, however, and thus does not stand as an impediment to the granting of defendants' summary judgment motion.

**9.** It appears that this letter was received by the deputy superintendent on February 12, 2007, and it is referred to in the grievance case history by that date. *See* Roberts–Ryba Aff. (Dkt. No. 44–4) Exh. A p. 21 (unnumbered).

**10.** Apparently Webster also sent a written complaint, dated February 13, 2007, to the DOCS Commissioner reiterating his allegation of harassment by Hoadley. Corcoran Decl. (Dkt. No. 44–9) ¶ 12. A copy of that complaint is not included in the record. It is unclear whether a separate investigation was conducted with respect to that complaint, or whether the complaint was addressed in the context of the investigation of the February 7, 2007 complaint. The record seems to sug-

Sergeant Hoadley responded in writing to Webster's grievance complaint to the Commissioner. Hoadley Decl. (Dkt. No. 44–11) ¶ 24 and Exh. F. In his memorandum Hoadley confirmed that he had met with Webster on the evening of February 7, 2007 and explained that during that encounter he asked Webster why, without Sergeant Hoadley's prior approval as staff advisor to the ILC, plaintiff had sent two letters, dated January 29, 2007 and February 2, 2007, to the superintendent and others complaining of certain prison conditions. *Id.* Regarding the need for prior approval of these letters, during the conversation Hoadley pointed out that DOCS Directive No. 4760, Section II, Subsection D, requires that inmate organizations be under the direct supervision of a staff advisor. *Id.* In response to Hoadley's comments Webster disputed that the ILC was required to obtain prior approval before sending letters to the administration and challenged Sergeant Hoadley to prove him wrong. *Id.* In his memorandum, defendant Hoadley recounted that Webster became argumentative during the conversation and that he warned Webster that he was close to issuing a misbehavior report.

Sergeant Hoadley also denied plaintiff's allegations of retaliation and a purported conflict of interest in serving as both staff advisor to the ILC and a member of the Inmate Grievance Review Committee ("IGRC"), adding that "Webster appears to [be] 'covering his back' and affording himself an alibi in attempt to perhaps become more and more antagonistic while serving as Chairman of the ILC." Hoadley Decl. (Dkt. No. 44–11) Exh. F p. 3. In a later written addendum to the memorandum, Hoadley acknowledged that he subsequently learned from the superintendent and deputy superintendent that the ILC is not considered an inmate organization for the purposes of Directive No. 4760; Hoad-

ley nonetheless continued to deny any harassment of Webster. *Id.*

Plaintiff's grievance against defendant Hoadley was referred by the IGRC to the facility superintendent, who denied the grievance, advising that Directive No. 4760 relieves the ILC from the constraints imposed on other inmate organizations, but stating that "given the recent misleading and inaccurate correspondence authored on behalf of the ILC by the grievant, he would be well served to have his correspondence reviewed by a knowledgeable party." Hoadley Decl. (Dkt. No. 44–11) Exh. E p. 7. Plaintiff appealed that unfavorable determination to the DOCS Central Office Review Committee ("CORC"), which upheld the superintendent's determination, clarifying that plaintiff's assertion that Hoadley's position as ILC advisor was in conflict with his position on the IGRC was without merit and advising that the grievance program is not intended to support an adversary process. *Id.* at p. 1.

Defendant Thomas Napoli, a DOCS employee who at the relevant times served as the inmate grievance supervisor at Cayuga, was responsible for taking all inmate complaints, researching them, and attempting to obtain informal resolution; if unsuccessful, it was his duty to provide involved DOCS employees with the information necessary to initiate an appropriate investigation. Napoli Decl. (Dkt. No. 44–8) ¶¶ 3–4. In or about March of 2007, Napoli attended an ILC meeting during which he heard the vice chairperson of the ILC make derogatory remarks regarding the superintendent. *Id.* at ¶¶ 9–10. On the following day Napoli interviewed some inmates, including an inmate named Shuts who was scheduled to be released from prison. *Id.* at ¶ 11. Shuts reported to Napoli that plaintiff and the vice chairperson of the ILC were attempting to intimidate other ILC members and pursue their

gest, however, that separate investigations re- sulted from the two complaints.

own agendas. *Id.* Conduct of that nature is contrary to the role of the ILC, whose purpose is to provide effective communications between inmates and the prison administration for accurate dissemination and exchange of information. *Id.* at ¶ 8; *see also* DOCS Directive No. 4002. On March 1, 2007 Napoli issued plaintiff a misbehavior report directly as a result of the information received from inmates as well as his observations while in attendance at the ILC meeting. *Id.* at ¶ 8 and Exh. A. Napoli cited plaintiff for violation of prison rules as a result of his intimidation and harassment of other inmates involved on the ILC.

Defendant David Halcott, who at the relevant times was a corrections lieutenant at Cayuga and served as the watch commander for all shifts, as well as a hearing officer, received information corroborating what Napoli had reported regarding plaintiff's actions on the ILC. Halcott Decl. (Dkt. No. 44–10) ¶¶ 4–5, 12. Halcott interviewed three inmates; like Shuts, all three reported that plaintiff had a negative attitude toward the administration and that plaintiff and the vice chairperson of the ILC recommended that nobody speak directly to the administration and instead circumvent their authority. *Id.* at ¶ 12. As a result of this information, Halcott co-signed the March 1, 2007 misbehavior report, which charged the plaintiff with organizing to the detriment of the order of the facility, providing false statements, and harassment in violation of prison rules. Halcott Decl. (Dkt No. 44–10) ¶ 8 and Exh. A.

A Tier III disciplinary hearing was conducted by defendant Robert Chapin over a two-day period, concluding on March 5, 2007, to address the charges lodged in the March 1, 2007 misbehavior report. Halcott Decl. (Dkt No. 44–10) ¶ 11 and Exh. B. At the close of the hearing plaintiff was found guilty of all three charges and sentenced to three months in disciplinary SHU confinement, with a corresponding loss of package, commissary, and telephone privileges.[11] *Id.*; *see also* Chapin Decl. (Dkt. No. 44–6) ¶¶ 4, 11 and Exhs. A and B. An appeal of that determination to the DOCS central office resulted in modification of the hearing officer's finding, ordering dismissal of the charge of organizing a demonstration, but with no resulting change in the penalty imposed. Chapin Decl. (Dkt. No. 44–6) ¶ 13 and Exh. C.

On or about May 14, 2006, after serving an SHU disciplinary sentence, plaintiff was assigned to a two-person cell occupied by another inmate despite having a medical exemption from double-bunking. Complaint (Dkt. No. 1) ¶¶ 49–50. The record is equivocal as to what followed and the chronology of the relevant events. In his complaint, plaintiff alleges that on the following day he brought his medical exemption to the attention of defendant Michael Maher, the deputy superintendent of security at the facility, but Maher failed to take any action. *Id.* at ¶¶ 50–56. According to defendant Maher, he was not aware that plaintiff had such an exemption until receiving a letter dated August 14, 2006 from the plaintiff requesting reassignment to a single cube with a window based upon his medical permit. Maher Decl. (Dkt. No. 44–12) ¶ 6 and Exh. A. Upon receipt of this letter, Deputy Superintendent Maher assigned a member of his staff to look into

---

**11.** SHU is a more restrictive form of disciplinary confinement than keeplock, although inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. They are allowed two showers per week and one of hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

the matter. On August 18, 2006 Maher received a memorandum advising that plaintiff did in fact possess a medical permit for a single cube, but nothing in the medical permit required that he also be located near a window. *Id.* at ¶ 7 and Exh. B. Accordingly, plaintiff was moved to a single cube on that same date. *Id.*

The last of plaintiff's claims surrounds his contention that certain of his mail was withheld by defendant A. Costello, the mail room supervisor at Cayuga. *See* Complaint (Dkt. No. 1) ¶ 84. Plaintiff attributes the alleged withholding of his mail to a mail watch implemented by prison officials at Cayuga. *Id.* ¶ 83. The record, however, fails to support plaintiff's surmise in this regard. After being placed on notice of the allegation defendant Costello reviewed all mail watch requests submitted by the superintendent, the only person at the facility authorized to implement a mail watch, between November of 2006 through the end of 2009; that review failed to substantiate plaintiff's claim that he was ever put on mail watch during that time period.[12] Costello Decl. (Dkt. No. 44–5) ¶¶ 5–7.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 18, 2008. Dkt. No. 1. Named as defendants in plaintiff's complaint, all in both their individual and official capacities, are Brian Fischer, Commissioner of the DOCS; Michael Corcoran, the superintendent at Cayuga; Michael Maher, the deputy superintendent of the facility; Corrections Sergeant Vincent Hoadley; Thomas Napoli, the inmate grievance supervisor at Cayuga; Corrections Officer R. Clink;

Anne Costello, a mail room supervisor at Cayuga; Corrections Captain Robert Chapin; and Corrections Lieutenant David Halcott. *Id.* Plaintiff alleges that his civil rights complaint is filed pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and additionally requests that the court exercise supplemental jurisdiction over his state law tort claims.[13] *Id.* The essence of plaintiff's complaint is that he suffered discrimination, harassment, and adverse actions taken by prison officials as a result of his position with and activities while on the ILC. *See generally id.* Webster claims violations of the First, Eighth and Fourteenth Amendments to the United States Constitution as well as state laws and regulations. Liberally construed, also included within plaintiff's complaint are what appear to be claims of illegal search and seizure, deliberate indifference to his medical needs, conspiracy, and damages for loss of personal property.

On June 1, 2009, following the completion of pretrial discovery, defendants filed a motion for summary judgment seeking dismissal plaintiff's entire complaint. Dkt. No. 28. In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) plaintiff has failed to establish personal involvement on the part of defendants Fischer, Costello, and Corcoran; 2) he has failed to state viable retaliation, due process, and medical indifference claims, or claims under sections 1981, 1985 and 1986; and, 3) plaintiff has failed to adequately allege state law tort claims. Plaintiff has since filed an opposition to the defendants' motion, consisting of a two-page written, unsworn statement.[14] Dkt. No. 55. Defendants' motion,

---

**12.** Although defendants' motion includes an affidavit from Superintendent Corcoran addressing other matters, the affidavit does not address plaintiff's mail watch claim. *See* Corcoran Decl. (Dkt. No. 44–9).

**13.** Plaintiff's complaint does not separately state and identify his purported state law claims.

**14.** With their motion, defendants properly filed with the court a statement of materials

which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building*

facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Under that rule, in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it, in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the assertions set forth in defendants' Local

Rule 7.1(a)(3) Statement are now deemed to have been admitted by him. *Id.*; *see, e.g., Elgamil v. Syracuse Univ.*, No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). As will be seen, however, my recommendation in this matter does not hinge upon those deemed admissions.

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Personal Involvement*

■ In their motion, defendants first seek dismissal of plaintiff's claims against defendants Fischer, Costello, and Corcoran, on the basis that he has failed to show their personal involvement in the alleged constitutional violations. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir.1986).

■ The three defendants on whose behalf this argument is made appear to have been named by Webster as defendants by virtue of their supervisory positions within the DOCS. It should be noted, however that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.2003); *Wright*, 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau*,

554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal*, — U.S. —, 128 S.Ct. 2931, 171 L.Ed.2d 863 (2009); *see also, Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986).

### 1. *Commissioner Fischer*

■ Plaintiff's complaint names Commissioner Fischer in a single cause of action alleging that he was responsible for supervision of inmates and correctional employees and that he was notified in letters sent throughout the period between January and March 2006 of Corrections Officer Clink's retaliatory conduct. Complaint (Dkt. No. 1) ¶¶ 22, 26. During his deposition, plaintiff clarified that he seeks to hold defendant Fischer liable because "he's the Commissioner of Correctional Services [,and] he was made aware of the situation ... through letters." Webster Tr. (Dkt. No. 44–2) pp. 26–27, 47.

In a declaration in support of defendants' motion, Fischer states that as commissioner and chief executive officer of the DOCS, he is responsible for the overall management of the agency and that the day-to day management of the prison facilities within the system is within the responsibility of the superintendent of each facility. Fischer Decl. (Dkt. No. 44–7) ¶¶ 5–6. As Commissioner of the DOCS, Fischer receives thousands of letters each year from inmates and other individuals on behalf of inmates. *Id.* When an inmate letter arrives, typically a clerical staff member within his office will review it and determine the particular division or bureau to which the letter should be forwarded along with an instruction to prepare a response or to take whatever action the official deems appropriate, including in some cases making no response. *Id.* at ¶ 6. Commissioner Fischer further states that although a review of the records of the Commissioner's office shows that plaintiff sent three letters addressed to him, dated January 29, 2007, March 1, 2007, and April 17, 2007, he does not recall these letters, and he did not personally respond to them; instead, they were handled by members of his staff. *Id.* at ¶¶ 8–9.

The January 29, 2007 and April 17, 2007 letters do not relate to any of the constitutional violations alleged in plaintiff's complaint; rather, in those letters plaintiff complains about the alleged improper use of ILC funds and requests an accounting. *Id.* at Exh. A. It is true that plaintiff did allege in the March 1, 2007 letter that he was being retaliated against for having sent the prior letters regarding the use of ILC funds. *See id.* However, plaintiff has produced nothing but this single letter in an attempt to sustain liability against Fischer. There is no evidence that Fischer had knowledge of and failed to remedy any unconstitutional conduct, that he created or allowed to continue a policy or custom under which retaliation was permitted to occur, or that he knew of and failed to act on information indicating that plaintiff's rights were being violated. "[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) (citing, *inter alia, Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y. 1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)). Accordingly, I recommend that plaintiff's claims against Fischer be dismissed.

### 2. *Superintendent Corcoran*

■ Turning next to plaintiff's claims against Superintendent Corcoran, his complaint alleges two causes of action against Corcoran, the first asserting supervisory liability for Corrections Officer Clink's retaliatory conduct, and the other claiming damages for loss of his personal property at the time of his transfer to another DOCS facility. For the most part, Webster's claims against defendant Corcoran are premised upon letters written to him by the plaintiff as well as a few conversations with the plaintiff during which Webster "explained to him the treatment [he] was getting." Webster Tr. (Dkt. No. 44–2) pp. 37–38. Plaintiff alleges that Superintendent Corcoran is responsible as a supervisor for both incidents and that he was notified of defendant Clink's harassment by written complaints sent by the plaintiff in January through March, 2006 timeframe. Complaint (Dkt. No. 1) ¶¶ 20, 25, 77.

Corcoran, who is the superintendent of Cayuga, states that he has no recollection of plaintiff. Corcoran Decl. (Dkt. No. 44–

9) ¶ 5. Corcoran acknowledges that facility records reveal plaintiff filed a grievance claiming harassment on February 12, 2007, complained of retaliation in a letter dated March 6, 2007 to Superintendent Corcoran, and wrote letters to the Commissioner dated February 22, 2006 and February 13, 2007 complaining of matters which defendant Corcoran was requested to investigate. *Id.* at ¶¶ 7, 13, 20, 24. Superintendent Corcoran delegated the responsibility to conduct investigations with regard to all of those matters. *Id.* at ¶¶ 9, 16, 23, 26. Plaintiff's grievance of February 12, 2007 was denied, and on appeal the denial was affirmed by the CORC. Corcoran Decl. at ¶ 11; *see also* Hoadley Decl. (Dkt. No. 44–11) Exh. E. The investigations of plaintiff's letters all concluded that no DOCS employee had engaged in improper conduct. *Id.* at ¶¶ 22, 25. As with Commissioner Fischer, plaintiff has failed to produce evidence establishing Corcoran's personal involvement with respect to the majority of the claims alleged in the complaint.

To the extent that plaintiff's retaliation claim encompasses his removal from the ILC, however, the record shows sufficient personal involvement on behalf of Corcoran. Corcoran admits that he exercised his discretion in removing plaintiff from the ILC after receiving the Napoli and Halcott misbehavior report of March 2, 2007. Corcoran Decl. (Dkt. No. 44–9) ¶¶ 27–28. For purposes of that claim, defendants' motion to dismiss plaintiff's complaint as against Superintendent Corcoran based upon lack of personal involvement should be denied.[15]

### 3. *Senior Mail and Supply Clerk Costello*

 With regard to defendant Anne Costello, plaintiff's complaint alleges that she initiated and/or participated in an illegal watch of plaintiff's mail.[16] Complaint (Dkt. No. 1) ¶¶ 83–88. Costello is a senior mail and supply clerk at Cayuga responsible for supervising mail room staff during her shift. Costello Decl. (Dkt. No. 44–5) ¶¶ 2–3. Costello affirms that she never met Webster, and that only the superintendent of the facility has authority to institute a mail watch. *Id.* at ¶ 5. Costello advises that upon receipt of plaintiff's complaint in this action Costello conducted search of facility records for the period of November 2006 through 2009 which revealed that the superintendent did not institute a watch of plaintiff's mail ordered during that period of time. *Id.* at ¶ 7. Plaintiff admits that he never met Costello and that he has sued her simply because she was the supervisor of the mail room at the relevant times. *Id.* at p. 43.

 "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson,* 347 F.3d at 435 (citations omitted). For this reason, plaintiff's allegations against Costello are patently insufficient to establish the requisite personal involvement in the constitutional violations alleged. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same). I therefore recommend that plaintiff's claims against defendant Costello be dismissed.

In sum, for the foregoing reasons I recommend that all claims against Costello and Fischer, and all those against Corcoran with the exception of plaintiff's retalia-

---

**15.** As will be seen, plaintiff's retaliation claim against defendant Corcoran is nonetheless destined to fail on the merits. *See* pp. 186–87, *post.*

**16.** While plaintiff refers to defendant Costello in the masculine, from the record before the court it appears clear that she is a woman. *See* Costello Decl. (Dkt. No. 44–5).

tion cause of action insofar as plaintiff alleges that his removal from the ILC was an adverse action taken as a result of constitutionally protected conduct, be dismissed for lack of personal involvement.

## C. *Retaliation*

To support his claim of retaliation Webster alleges that his First Amendment rights were violated because he was involved in the ILC and voiced complaints regarding the facility administration and institutional policies. Plaintiff contends that as a result of this constitutionally protected activity he was subjected to harassment and threats, disciplinary charges were lodged against him, and ultimately he was removed from the ILC. Noting the ease with which such claims can be incanted by a prison inmate, defendants seek dismissal of these claims as legally insufficient.

 When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir. 1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, sub. nom Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003).

 In order to establish a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must prove that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492. If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only a conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing a plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

### 1. *Defendants Clink and Hoadley*

 In essence, plaintiff alleges that he was harassed by Corrections Officer Clink commencing when he entered the ASAT unit because Clink did not like the presence of ILC representatives in his

dorm. Plaintiff maintains that he filed a complaint against defendant Clink for discriminating against and harassing him, and that thereafter defendants Clink and Hoadley retaliated against him by, among other things, issuing the April 14, 2006 misbehavior reports and subjecting him to disciplinary action.

■ It is well recognized that the filing of a grievance is protected conduct and can thus satisfy the first prong of a retaliation claim. *Graham,* 89 F.3d at 80. The right of an ILC member to voice criticisms regarding prison conditions is also a clearly established constitutional right. *Shaheen v. Filion,* No. 9:04–CV–625, 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (Scullin, S.J. & Homer, M.J.) (citing *Simmat v. Manson,* 535 F.Supp. 1115, 1117–18 (D.Conn.1982)). Plaintiff has therefore sufficiently alleged that his engagement in constitutionally protected conduct. Additionally, after the filing of his grievance plaintiff was undeniably subjected to adverse action by way of a prison disciplinary proceeding and sanctions; he has, therefore, also established the adverse action element of his retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir. 2004).

■ In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to withstand a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is normally lacking, a plaintiff may cite such factors as "temporal proxim-

ity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

On January 30, 2006, plaintiff filed a grievance alleging harassment by defendant Clink. Roberts–Ryba Aff. (Dkt. No. 44–4) Exh. A pp. 30–36 (unnumbered). Plaintiff later sent two letters, dated February 10 and 16, 2006, to Superintendent Corcoran voicing the same complaints. *See id.* Plaintiff also claims that he complained about Clink directly to Hoadley. Webster Tr. (Dkt. No. 44–2) p. 111. Several weeks later, on April 14, 2006, Clink and Hoadley authored separate misbehavior reports accusing plaintiff of failing to comply with his medical restriction.[17]

It is true that a closeness in time between protected activity and the issuance of a misbehavior report can sometimes give rise to an inference that the two are connected and suffice to defeat a summary judgment motion seeking dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 14). In many circumstances, however, this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y. 2000) (citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1996)); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006) (McAvoy, S. J.). Notably, in this case, at least two months passed between plaintiff's complaints and the April 14, 2006 misbehavior reports and the resulting determination that plaintiff was guilty of the charges, which was issued at the con-

---

**17.** Those misbehavior reports accused plaintiff of attending an ILC meeting without authorization, and thus being out of place, after being told that he was under medical restric- tion from participation in program and recreation due to chronic back injuries and was therefore not allowed to leave his dorm. Complaint (Dkt. No. 1) ¶¶ 33, 40.

clusion of disciplinary hearing on April 19, 2009. Accordingly, at the outset it is questionable whether the disciplinary action followed plaintiff's complaints close enough in time to raise an inference of retaliation.

Even assuming the requisite proximity in time exists to support an inference that the protected activity and adverse action are linked, the overwhelming evidence in the record proves that this alone is insufficient to establish a retaliatory motive in this case. Considering first plaintiff's disciplinary history, in certain circumstances prior good behavior may supply evidence of such motive. *Barclay,* 477 F.Supp.2d at 558. In this case, however, the plaintiff is unable to rely on a favorable disciplinary record to prove his claim. To the contrary, the record reveals that plaintiff began receiving cube violations and misbehavior reports soon after he entered the more restrictive F–2 unit, even before Corrections Officer Clink, who was responsible for supervising the ASAT program, returned from his vacation. Plaintiff soon responded by making accusations against Clink, and later against Hoadley. Each of plaintiff's accusations was investigated and found to be without merit, and it was suggested that plaintiff was having difficulty abiding by the strictly enforced rules in the ASAT program. The evidence suggests that plaintiff was issued at least three misbehavior reports before April of 2006, *see* Clink Decl. (Dkt. No. 44–13) Exh. A, one of which is included in the record before the court.[18] Corrections Officer Clink issued Webster a misbehavior report on February 10, 2006 for lying about his whereabouts, a violation of which plaintiff was found guilty after a disciplinary hearing, and for which he received disciplinary

sanctions, but did not appeal. *See* Clink Decl. (Dkt. No. 44–13) Exh. B.

On April 14, 2006, plaintiff was issued not one but three separate misbehavior reports by three different corrections officers, one of whom is not named as a defendant in this lawsuit. On that date, plaintiff admittedly was under medical restriction providing that he be excused from all activities and programs and confined to his housing unit. Notwithstanding this restriction, on three different occasions that day plaintiff attempted to attend activities outside of his F–2 dorm unit. In the face of his first misbehavior report at 8:20 a.m. that morning and a warning from defendant Clink that he was restricted and could not attend any outside program, plaintiff apparently continued to do so. Here, plaintiff's prior poor disciplinary record undermines his contention that the April 14, 2006 misbehavior reports were solely retaliatory.

If plaintiff were able to point to a finding of not guilty on the charges in these misbehavior reports, then there might be some question as to retaliatory motive. *See Rivera,* 119 F.Supp.2d at 339. Here again, however, the record belies plaintiff's bald claim of retaliation. At the Tier II hearing conducted with respect to all three April 16, 2006 misbehavior reports, plaintiff acknowledged not only his written medical restriction, but that he had left his housing unit for other activities, arguing that the restriction did not really mean that he was completely prohibited from leaving the F–2 unit and that another unnamed officer had permitted him to go to the commissary despite his medical restriction. In light of these admissions, at

---

18. As was previously noted, plaintiff was issued a misbehavior report on February 10, 2006 based upon his admission that despite signing up for Jumah services when he left his cube area, he instead went to the commissary.

Clink Decl. (Dkt. No. 44–13) Exhs. B and C. I do not construe plaintiff's complaint as alleging that this misbehavior report was issued in retaliation for his having engaged in protected activity.

the close of the hearing plaintiff was found guilty of all charges contained in both the Clink and Hoadley misbehavior reports.

Based upon the record as a whole, I conclude that no reasonable factfinder could find that the misbehavior reports issued on April 14, 2006 were in retaliation for plaintiff's protected activity. For this reason, I recommend dismissal of plaintiff's retaliation claims against defendants Clink and Hoadley.

### 2. *Defendants Napoli, Halcott, and Chapin*

 Plaintiff also alleges retaliation with respect to defendants Napoli, Halcott, and Chapin, asserting that the March 1, 2007 misbehavior report written by defendant Napoli and co-signed by defendant Halcott was issued only because Webster made written and oral statements, demands, and requests involving changes in institutional conditions, policies, rules, regulations, and laws affecting the institution. According to plaintiff, Hearing Officer Chapin's finding of guilt on all charges contained in that misbehavior report was likewise retaliatory. As with his claims of retaliation against Clink and Hoadley, the record lacks any evidence to support plaintiff's conclusory allegations of retaliatory motives.

During his deposition testimony, plaintiff attempted to link the misbehavior report to his work on the ILC, stating that "[t]hey were pissed off about the soap balls." Webster Tr. (Dkt. No. 44–2) p. 216. Plaintiff conceded, however, that he had no evidence to support his contention but only his belief that Napoli wrote the misbehavior report for retaliatory reasons. *Id.* at p. 217. When asked if he believed that Halcott retaliated against him for the same reason, plaintiff stated, "I would imagine so." Webster went on to explain that he "really [does not] know exactly motivation, but this is the only thing I can think. I can't say for sure this would be his motivation, but I can't think what else it would be." *Id.* at p. 218.

The only evidence in the record that might suggest the March 2, 2007 misbehavior report was issued in retaliation for complaints to the administration is the temporal proximity between plaintiff's letter of February 2, 2007 to Superintendent Corcoran raising a safety concern regarding the blue soap balls used by inmates and the disciplinary charge issued a month later. There is no evidence, however, that defendants Napoli, Halcott, or Chapin were even aware of this letter to the superintendent or any other complaints that plaintiff made regarding the institution and/or the administration. Plaintiff's soap ball complaint as well as his concerns regarding the use of ILC funds were investigated by Sergeant Hoadley, and there is no evidence suggesting that Napoli, Halcott, or Chapin were involved. Additionally, plaintiff does not allege that he filed any grievances or complaints against Napoli, Halcott, or Chapin which might have served as motivation to retaliate.

Nor has plaintiff adduced any evidence of statements made by these defendants revealing retaliatory motives. To the contrary, all three expressly deny any such improper motive. *See* Napoli Decl. (Dkt. No. 44–8) ¶¶ 6, 11; Halcott Decl. (Dkt. No. 44–10) ¶¶ 7, 10; and, Chapin Decl. (Dkt. No. 44–6) ¶¶ 6, 14. Additionally, Napoli explains that he filed the misbehavior report based upon information he received in a interview with an inmate who was being released; that inmate told Napoli that Webster and the vice chairperson of the ILC were intimidating ILC members in order to further their own agenda. Napoli Decl. (Dkt. No. 44–8) ¶¶ 6, 11. Halcott similarly confirms that he co-signed the misbehavior report because he received the same information from three different

inmates who were on the ILC. Halcott Decl. (Dkt. No. 44–10) ¶¶ 7, 10.

Again, plaintiff is unable to rely on a good disciplinary history as circumstantial evidence of retaliatory motive. In the year preceding the March 1, 2007 misbehavior report, plaintiff was issued several misbehavior reports, found guilty on a number of charges, and suffered disciplinary sanctions on at least two prior occasions. Nor can plaintiff show that he was absolved of the charges, which might also provide some support for his retaliation claims. Instead, after conducting a Tier III disciplinary proceeding, Hearing Officer Chapin determined that Webster was guilty on all three charges. *See id.* at Exh. B. The hearing officer's findings of guilt on two of the three charges (harassment and making false statements) as well as the penalty imposed were upheld on appeal. *Id.* at Exh. C.

Standing alone, the mere temporal closeness of plaintiff's letters of complaint to the superintendent and the March 2007 disciplinary proceedings is insufficient to establish retaliation. I am thus constrained to conclude that when considered in the context of the entire record, no reasonable juror could find that the March 1, 2007 misbehavior report was issued in retaliation for plaintiff's constitutionally protected conduct.

### 3. *Defendant Corcoran*

 Approximately two months after plaintiff was issued disciplinary sanctions as a result of the March 1, 2007 misbehavior report, Superintendent Corcoran removed plaintiff from his position as chairman of the ILC, based upon his disciplinary record. Corcoran Decl. (Dkt. No. 44–9) ¶ 29. To the extent that plaintiff relies upon this action to support a claim of retaliation against defendant Corcoran, his claim must fail. While at least one court in this district has recognized a constitutional right of an inmate to serve as a grievance representative, *Gill v. Riddick,* No. 9:03–CV–1456, 2005 WL 755745, at *10 (N.D.N.Y. Mar. 31, 2005) (Treece, M.J.), that is not to say that there is a constitutional right to remain on the ILC once appointed. *Compare Salahuddin v. Coughlin,* 591 F.Supp. 353, 361 (S.D.N.Y. 1984) ("an inmate has no protectable right to remain on the ILC...."). To the contrary, "[p]ursuant to DOCS Directive 4002, the Superintendent has discretion to exclude membership on the ILC to those inmates who have recent or chronic disciplinary problems." *Gonzalez v. Narcato,* 363 F.Supp.2d 486, 496 (E.D.N.Y. Mar. 24, 2005) (citing DOCS Directive No. 4002).[19]

In his notification to Webster Superintendent Corcoran advised plaintiff that he was being removed from the ILC due to his disciplinary history. The record supports this contention, revealing that over a one-year period, during which he was assigned to the ASAT unit, plaintiff amassed a disciplinary history that included several misbehavior reports. Significantly, the March 1, 2007 misbehavior report related directly related to his attempts to intimidate and control the ILC to the detriment of the prison administration.

The Second Circuit "ha[s] established a 'presumption that a prison official's acts to maintain order are done for a proper pur-

---

**19.** "In order for any action to constitute adverse action, a plaintiff must establish that the adverse action would deter a similarly situated individual from exercising his or her constitutional rights." *Shaheen v. Filion,* No. 9:04–CV–625, 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (Scullin, S.J.) (cit-

ing (*Dawes,* 239 F.3d at 492)). It is questionable whether a fairminded jury would find plaintiff's removal from the ILC be sufficiently adverse to deter an inmate in his circumstances from exercising his constitutional rights.

pose.'" *Hynes v. Squillace,* 143 F.3d at 657 (quoting *Rivera v. Senkowski,* 62 F.3d 80,86 (2d Cir.1995)). In addition, it is well established that "prison officials are entitled in the name of discipline, order and security to forbid collective organizational activity among inmates." *Salahuddin,* 591 F.Supp. at 361 (citing *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 128–29, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)). Defendants have established a proper basis for plaintiff's removal from the ILC, and Superintendent Corcoran acted well within his discretion when ordering that measure. *Gonzalez,* 363 F.Supp.2d at 496. Accordingly, insofar as plaintiff makes a claim of retaliation based upon his removal from the ILC, that claim must be dismissed.

### D. *Harassment*

█ Though not specifically addressed by defendants in their motion, during his deposition plaintiff asserted that the retaliation he suffered included harassment and threats by defendants Clink and Hoadley. Webster Tr. (Dkt. No. 44–2) pp. 60–61, 98–100, 104,135, 146. According to plaintiff, Corrections Officer Clink harassed Webster by going through his cube every day, telling the plaintiff that he did not like him participating in the ILC, and making derogatory remarks. *Id.* at pp. 60–61. Plaintiff asserts that defendant Hoadley harassed plaintiff by threatening him to "watch his back" and calling him a liar. *Id.* at pp. 98–100, 104,135, 146. Liberally construed, plaintiff's allegations of harassment are, at best, an attempt to state a violation of his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff has failed, however, to allege any conduct that would warrant Eighth Amendment protection.

█ 42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d

Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996) (citations omitted). Accordingly, the mere allegation of verbal abuse, however repugnant it may be, does not rise to the level of a constitutional violation and is not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J.) ("[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

There are no allegations that plaintiff suffered from the infliction of any physical injury or pain as a result of defendants' harassing conduct. Plaintiff specifically testified at his deposition that Hoadley did not use any physical force against him. Webster Tr. (Dkt. No. 44–2) p. 146. Plaintiff has therefore failed to meet the threshold requirement for an Eighth Amendment violation of showing the "unnecessary and wanton infliction of pain" by prison officials. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Consequently, I find plaintiff has failed to establish any facts that would support an Eighth Amendment violation.

### E. *Due Process*

A portion of plaintiff's complaint centers upon his contention that his right to procedural due process was abridged in connection with his March 4–5, 2007 disciplinary hearing. In their motion, defendants as-

sert that plaintiff's due process claim lacks merit.

■ To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir.1996).

### 1. Liberty Interest

■ At the outset, plaintiff has failed to demonstrate that he has suffered deprivation of a constitutionally protected liberty interest. The Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Sealey*, 197 F.3d at 583 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293). Atypicality in a *Sandin* inquiry is normally a question of law.[20] *Colon v. Howard*, 215 F.3d 227, 230–31 (2d Cir.2000); *Sealey*, 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335–36 (2d Cir.1998); *Brooks v. DiFasi*, 112 F.3d 46, 48–49 (2d Cir.1997); *see also Williams v. Goord*, 111 F.Supp.2d 280, 289 (S.D.N.Y. 2000) (citations omitted) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*.[21] *Colon*, 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231–32 (305 days of SHU confinement constitutes an atypical and sufficient departure).[22]

In his complaint, plaintiff alleges that he was confined to SHU for ninety days, but does not allege that the resulting conditions imposed an atypical and substantial hardship nor does he allege any facts that might suggest that this was the case. In

---

**20.** In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon*, 215 F.3d at 230–31; *Sealey*, 197 F.3d at 585.

**21.** Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485–86, 115 S.Ct. at 2301. In explaining its reasoning, the Court found that

the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

**22.** In *Colon*, a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232–34 (Newman, C.J.), at 235–37 (Walker, C.J. and Sack, C.J., concurring in part).

his deposition, Webster testified only that in SHU he was deprived of "freedom, talking to my family on the phone, everything that wasn't SHU[, and] I had a lot of problems breathing at night because they wouldn't let me have my breathing machine, my sleep [apnea] machine." Webster Tr. (Dkt. No. 44–2) pp. 230–231. Plaintiff's confinement to SHU for a period of ninety days, without more, is insufficient to raise a constitutionally protected liberty interest. *Mortimer Excell v. Fischer*, No. 08–CV–945, 2009 WL 3111711, at *9 (N.D.N.Y. Sept. 24, 2009) (Hurd, J.) ("[C]ourts have roundly rejected the notion that ... a short period of confinement, without additional hardships, creates a liberty interest even when confinement is completely segregated, such as when an inmate is sent to ... [SHU].") (citing *Sealey*, 197 F.3d at 589–90); *see also Borcsok v. Early*, No. 9:03–CV–395, 2007 WL 2454196, at *9 (N.D.N.Y.2007) (Sharpe, J.) (finding that 90–day confinement in SHU alone with 90–day loss of packages, commissary and telephone privileges insufficient to raise a liberty interest without showing there as an atypical and significant hardship). Accordingly, I find that dismissal of plaintiff's due process cause of action on this basis alone would be appropriate.

### 2. *Procedural Protections*

■ Even assuming that plaintiff were able to prove that he suffered a deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless fail because, based on the record now before the court, it is clear he was afforded ample due process. The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are both modest and well-established, the contours of the required protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 563–67, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974). Under *Wolff*, the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564–70, 94 S.Ct. at 2978–83. In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence".[23] *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

The record establishes that plaintiff received a copy of the misbehavior report setting forth the charges against him in advance of the hearing. Chapin Decl. (Dkt. No. 44–6) Exh. A at p. 2. A disciplinary hearing was conducted and was recorded. *See generally id.* At the commencement of the hearing the plaintiff confirmed that he was aware of and understood the charges against him. *Id.* at pp. 2–5. Plaintiff received assistance in preparing for the hearing and was permitted to give an oral statement as well as to offer testimony from his own witnesses. *See generally id.* After announcing his disposition the hearing officer advised plaintiff of his right of appeal. Chapin. Decl. A (Dkt. No. 44–6) Exh. A p. 73.

---

**23.** The "some evidence" standard under *Hill* has been described as considerably tolerant. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir.2000). To be sure, the Fourteenth Amendment requires that at least some "reliable evidence" be contained in the record supporting the hearing officer's determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir.2004) (*quoting, inter alia, Luna v. Pico*, 356 F.3d 481, 488 (2d Cir.2004)).

Plaintiff later sought review by the superintendent, and the hearing officer's determination as to two of the three charges and the sentence were upheld on appeal. Chapin Decl. (Dkt. No. 44–6) Exh. C.

The hearing officer's determination of guilt hinged upon his finding that defendants Napoli and Halcott were credible witnesses. Chapin Decl. (Dkt. No. 44–6) ¶ 12. Both of those defendants testified that they had been informed by other inmates that plaintiff was trying organize the ILC by intimidation and that the plaintiff had advised other inmates to bypass facility administration. *Id.* Chapin also relied on credible evidence from an inmate that was being released who reported that plaintiff was spreading disparaging information about the prison administration regarding alleged missing ILC funds and poor administration. *Id.* The hearing officer's determination was therefore supported by some evidence, thereby meeting the minimum requirements of the Fourteenth Amendment.

The only procedural defect alleged by the plaintiff to have occurred during the hearing is that the hearing officer called defendant Halcott to testify after he had already closed the proceedings. It is true that the hearing officer had announced that the evidence was closed before accepting Lieutenant Halcott's testimony. He then realized, however, that defendant Halcott, who had co-signed the misbehavior report, had not yet testified. *Id.* at ¶ 8. Defendant Chapin immediately went back on the record, with the plaintiff present, and was able to reach Halcott to testify by telephone. *Id.* Halcott testified before Chapin made any determination as to plaintiff's guilt or innocence. After the hearing officer questioned Halcott, Webster was given the opportunity to ask him questions. *Id.* The court finds that the timing of Lieutenant Halcott's testimony did not result in any prejudice to plaintiff, and plaintiff has identified none. To the contrary, the evidence in the record clearly establishes that the procedures that were provided to plaintiff were more than adequate to afford plaintiff the minimal process to which he was entitled.

In light of the lack of evidence in the record demonstrating that plaintiff's procedural due process rights were violated during the course of his disciplinary hearing, I recommend dismissal of his due process claims.[24]

### F. *Medical Indifference*

In their motion, defendants also assert that plaintiff's fourth cause of action, alleging that defendant Deputy Superintendent Maher was deliberately indifferent to his medical needs, is insufficient because plaintiff has failed to establish the requisite objective and subjective elements of deliberate indifference.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel

---

**24.** Plaintiff's complaint also alleges that he was deprived of his personal property when it was lost upon his transfer from Cayuga to another facility. Any procedural due process claim premised upon the claimed loss of his personal property during the transfer is also subject to dismissal. The alleged destruction or loss of plaintiff's personal property will not support a claim redressable under § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Second Circuit has held New York's post-deprivations remedies adequate to preclude a prisoner's due process claim for lost personal property. *Love v. Coughlin,* 714 F.2d 207, 208–09 (2d Cir.1983). In any event, acknowledging that he did in fact make a claim and received compensation for his lost property, at his deposition plaintiff stated his intent to not pursue this portion of his due process claim. Webster Tr. (Dkt.44–2) p. 229.

and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

■■■■ A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at

546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

### 1. *Serious Medical Need*

■■■■ In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need that is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from a condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

■■■■ The plaintiff in this case suffers from sleep apnea and has a medical permit restricting his housing location to a single bunk cell so that he can utilize a machine

that assists him in breathing at night. Apparently, upon his release from SHU confinement on May 14, 2006 plaintiff was housed in a double bunk cube. Plaintiff alleges that he informed the housing officer of his medical restriction and that, even after defendant Maher learned of plaintiff's condition, he refused to move Webster to a single bunk cube.

The record before the court fails to establish that plaintiff's sleep apnea was sufficiently serious to warrant Eighth Amendment protection. Plaintiff admits that he did not use the breathing machine for the ninety-day period that he was confined to SHU, yet there is no evidence, or even an allegation, that plaintiff experienced any physical deterioration or other consequences as a result of that lapse in treatment. Moreover, plaintiff admits that he used the breathing machine even though he was in a double bunk cube and that it was more of a safety concern for his cube mate than it was a medical concern for him. Webster Tr. (Dkt. No. 44–2) p. 209. In light of these facts, no reasonable juror could find that plaintiff's medical condition was sufficiently serious to warrant Eighth Amendment protection.[25]

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate

health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979; *Leach*, 103 F.Supp.2d at 546 (citing *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo*, 1998 WL 713809, at *2 (same).

▆▆ The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Plaintiff admittedly did not directly notify Maher of his medical restriction until August 14, 2006, and was moved within days thereafter. Webster Tr. (Dkt. No. 44–2) p. 207. Defendant Maher denies that he disregarded plaintiff's medical needs and states that upon receipt of plaintiff's letter he promptly directed his staff to look into the matter. Maher Decl. (Dkt. No. 44–12) ¶¶ 5–7. Maher also denies ever directing any of his staff to ignore the plaintiff's permit for a single cube or deliberately placing him at the bottom of a list for a single cube unit, and plaintiff has offered no evidence to counter that denial. *Id.* at ¶ 9. As a result, plaintiff has also failed to demonstrate that Deputy Superintendent Maher was deliberately indifferent to his serious medical needs. I therefore recommend that plaintiff's medical indifference claim be dismissed.[26]

### G. *Mail Watch*

▆▆ To the extent that plaintiff's complaint, when broadly construed, sets forth a claim for violation of his First Amendment rights as a result of an illegal mail

---

**25.** Plaintiff also claims that his condition requires that he be housed near a window, but upon questioning was unable to identify any medical reason for this alleged restriction. See Webster Tr. (Dkt. No. 44–2) p. 210.

**26.** Based upon a careful review of plaintiff's complaint, it appears that his medical indif-

ference claim is limited to defendant Maher and is based exclusively upon the alleged failure to honor his single cube medical permit. The record contains no evidence of any conduct that could be construed as deliberate indifference to plaintiff's medical needs on the part of any of the other defendants in the case.

watch, that claim is also subject to dismissal.

■ To be sure, it is well recognized that among the protections enjoyed by prison inmates, though not unfettered, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek*, No. 05–CV–172, 2007 WL 3254373, at *6 (N.D.N.Y.2007) (Sharpe, J.) (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir.2003)). That right, however, yields to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities, in which case no constitutional violation has occurred. *U.S. v. Workman*, 80 F.3d 688, 699 (2d Cir.1996), *cert. denied*, 519 U.S. 938, 117 S.Ct. 319, 136 L.Ed.2d 233 (1996).

In this case, plaintiff's mail watch claim is premised upon the delay in delivery of a single piece of mail—a Valentine's Day card from his girlfriend—that was allegedly stamped "missent to Malaysia" when it finally arrived. Plaintiff has offered no evidence to show that he was placed on mail watch or that any of his mail was illegally opened or intentionally misdirected. In fact, defendant Costello confirms that there is no record that plaintiff was the subject of a mail watch while housed at Cayuga. Once again, plaintiff has provided nothing but sheer surmise to show otherwise. As a result, plaintiff has failed to state a viable cause of action for violation of his First Amendment rights due to an illegal mail watch.

### H. *Seizure of Legal Folder*
■ Though not separately addressed by defendants in their motion, to the extent plaintiff's complaint alleges that he was searched and his legal folder was confiscated and his papers lost, it could be interpreted as an attempt to allege that defendants conducted an unlawful search

and seizure, in violation of the Fourth Amendment, and/or interference by the defendants with his access to the courts. *See* Complaint (Dkt. No. 1) ¶ 44–47.

In *Hudson v. Palmer*, the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). In concurring with the majority opinion authored by Chief Justice Burger in *Hudson*, Justice O'Connor succinctly pronounced that "[t]he fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects ...." *Id.* at 538, 104 S.Ct. at 3206. Plaintiff has therefore failed to state a cognizable claim under the Fourth Amendment.

■ Any claim for interference with his access to the courts similarly must fail. Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. *Bounds v. Smith*, 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (citations and internal quotation marks omitted). To establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury—that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendants' conduct. *Lewis v. Casey*, 518 U.S. 343, 353, 116 S.Ct. 2174, 2181, 135 L.Ed.2d 606 (1996).

In this instance plaintiff admits that the alleged loss of legal papers did not interfere with his access to court. *See* Webster Tr. (Dkt. No. 44–2) pp. 131–132. He has, therefore, failed to state and support a cognizable claim for denial of access to courts.

## I. *Violation of State Law*

In addition to setting forth constitutional claims, throughout his complaint plaintiff generally makes reference to and alleges violations of state law and regulations. To the extent that plaintiff attempts to state a claim under 42 U.S.C. § 1983 for the alleged violation of these provisions, such a claim fails as a matter of law.

 To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir.1993)). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson*, 01–CV–1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept. 24, 2008) (Hurd, J.) (internal quotation marks and citation omitted). This is so because the DOCS directives merely provide a system which the DOCS Commissioner has established to assist him or her in exercising discretion, which he or she retains despite any violation of those directives. *Id.*

Plaintiff's claims relating to state laws and regulations should therefore be dismissed.[27]

## J. *Conspiracy*

 Another claim that could be gleaned from plaintiff's complaint, when liberally construed, though again not addressed by defendants is one for conspiracy. To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F.Supp. 757, 763 (S.D.N.Y.1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983).

 Plaintiff's complaint contains only a single allegation regarding a conspiracy, alleging that defendant Maher "conspired with other defendant's and have shown himself to discriminatorily dereliction in his responsibilities and obligation to the care and custody of plaintiff's medical condition." Complaint (Dkt. No. 1) ¶ 54. Neither plaintiff's complaint nor the record before the court provides the identity of the parties to the alleged conspiracy, a showing of agreement or a "meeting of the minds", or any details as to the time and

---

**27.** While plaintiff initially alleges in his complaint that the court has supplemental jurisdiction over state law tort claims, no such claims are set forth in the body of the complaint. In any event, even if I were to conclude that plaintiff had sufficiently alleged state law tort claims, I would recommend that the court not exercise pendent jurisdiction over such claims, "pursuant to 28 U.S.C.

§ 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed." *Stephenson v. Albany County Policymakers*, Civ. No. 6:09–CV–326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

place of conspiracy or its objective. Such deficiencies are fatal to plaintiff's conspiracy claim. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999).

Because plaintiff has asserted claims of conspiracy in only vague and conclusory terms and, in the face of defendants' summary judgment motion, has failed to come forward with evidence to support his conspiracy claim, I recommend its dismissal as a matter of law.[28] *See Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1389, 113 L.Ed.2d 446 (1991); *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

### K. *Claims Under Sections 1981, 1985 and 1986*

Plaintiff's complaint, which is in other respects quite detailed, makes only passing reference to alleged violations of 42 U.S.C. §§ 1981, 1985 and 1986. Defendants assert that all of those claims are fatally deficient.

#### 1. *Section 1981*

■ Plaintiff's complaint purports to assert a claim under 42 U.S.C. § 1981, which provides that

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). As defendants correctly note, on its face that section prohibits discrimination in the making and enforcement of contracts. *See Mahmud v. Kaufmann,* 496 F.Supp.2d 266, 274 (S.D.N.Y.2007). Plaintiff's complaint clearly does not implicate a contract, and he has, therefore, failed to state a claim under section 1981. Additionally, in *Jett v. Dallas Independent Sch. Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the Supreme Court held that the exclusive remedy for vindicating rights guaranteed under section 1981 when the claim is against a state actor is through section 1983. *Whaley v. City Univ. of New York,* 555 F.Supp.2d 381, 401 (S.D.N.Y.2008). While the Second Circuit has yet to rule on the continued vitality of *Jett* following the amendments of section 1981 included within the Civil Rights Act of 1991, without clear guidance from that court, other district courts have declined to deviate from *Jett. Id.* at 401 (citing cases). Consistent with the decisions of these courts, I too opt not to deviate from the Supreme Court's analysis of section 1981 in *Jett.* For these reasons, any claim alleged under section 1981 should be dismissed.

#### 2. *Section 1985*

■ To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws or equal privileges and immunities secured by law. *United Brotherhood of Carpenters & Join-*

---

**28.** Even if plaintiff's conspiracy claim was adequately pleaded and supported in the record, in all likelihood it would be precluded based upon the intra-agency conspiracy doctrine, since it appears to be asserted against the various employees of the DOCS, each acting within the scope of his or her employ-

ment. *Little v. City of New York,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y.2007) (citations omitted); *see also Griffin–Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10–11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.).

*ers, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–39, 103 S.Ct. 3352, 3359–61, 77 L.Ed.2d 1049 (1983); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994); *Gleason v. McBride,* 869 F.2d 688, 694 (2d Cir.1989); *Patterson v. County of Oneida,* No. 00–CV–1940, 2002 WL 31677033, at *4 (N.D.N.Y.2002) (Hurd, J.), *aff'd in relevant part,* 375 F.3d 206 (2d Cir.2004); *Benson v. United States,* 969 F.Supp. 1129, 1135–36 (N.D.Ill.1997) (citing, *inter alia, United Brotherhood,* 463 U.S. at 834–37, 103 S.Ct. 3352); *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially by a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc–Sternberg,* 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) (per curiam); *Williams v. Reilly,* 743 F.Supp. 168, 173 (S.D.N.Y.1990) ("[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)).

Moreover, it is well settled that a plaintiff attempting to establish a claim under 42 U.S.C. § 1985(3) must demonstrate that the defendant under consideration acted with class-based invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 266–68, 113 S.Ct. 753, 758–59, 122 L.Ed.2d 34 (1993).

"When a plaintiff fails to establish membership in a protected group, a civil rights conspiracy complaint under 42 U.S.C. § 1985 may be dismissed." *Estes–El v. Town of Indian Lake,* 954 F.Supp. 527, 532 (N.D.N.Y.1997) (citation and internal quotations omitted).

██ Plaintiff's complaint alleges discrimination based upon his participation on the ILC. There are no allegations that he was discriminated against on the basis of race or some other cognizable suspect class. Similarly, as noted above, there are no allegations of an explicit agreement to deprive plaintiff of his constitutionally protected right, nor are there any allegations of fact that might provide circumstantial evidence of a tacit understanding to effect prohibited conduct. For these reasons, I find plaintiff's allegations insufficient to state a claim under section 1985(3) and as a result recommend that these claims also be dismissed.

### 3. *Section 1986*

Section 1986 provides, in relevant part that

> [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed shall be liable to the party injured....

42 U.S.C. § 1986. As can be seen, a claim under section 1986 is dependent up the existence of a claim under section 1985. Accordingly, since there is no claim stated under section 1985, plaintiff has likewise failed to state a claim under section 1986. *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.1978).

## L. *Eleventh Amendment*

Although not raised by defendants, there is a separate and independent basis for dismissal of plaintiff's claims against them to the extent they are sued in their official capacities. The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[29] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), *aff'd* 767 F.2d 908 (2d Cir.1985) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[30] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

Plaintiff's complaint states that it is brought against defendants in their individual and official capacities. Plaintiff's claims against defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects. As a result, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that plaintiff's damages claim against the defendants in their capacities as state officials be dismissed.

## IV. *SUMMARY AND RECOMMENDATION*

The centerpiece of plaintiff's complaint is his claim that he was harassed and retaliated against for participating in the ILC at Cayuga and voicing complaints regarding the operation of the facility and the prison administration. Although plaintiff alleges that the retaliation began with Corrections Officer Clink upon his transfer into the ASAT unit at Cayuga, the record shows that after entering that dorm plaintiff consistently failed to follow prison rules and was issued several misbehavior reports and received disciplinary sanctions solely as a result of his misconduct, not in retaliation for any complaints he may have made. Plaintiff has failed to show that any misbehavior report lodged against him was spawned by his filing of a grievance or other protected conduct. Indeed, it appears that plaintiff's grievances against individual officers were made only after he was cited for rules violations.

Addressing plaintiff's other claims, the record demonstrates that plaintiff received more than the constitutionally mandated minimal due process before being subjected to SHU confinement based upon the

---

29. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. In *Northern Ins. Co. of New York v. Chatham County* the Supreme Court reaffirmed that the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

30. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30–31, 112 S.Ct. at 364–65.

charges contained in the March 1, 2007 misbehavior report relating to his efforts to control and intimidate the ILC, and that his removal from that committee was not only well within the discretion of Superintendent Corcoran but was justified by plaintiff's actions.

Plaintiff has produced no evidence establishing personal involvement on the part of Fischer, Costello, or Corcoran in any constitutional violation alleged, and his damages claims against defendants in their official capacities are precluded by the Eleventh Amendment. Likewise, plaintiff has adduced no evidence to support his claims of an unconstitutional search and seizure of his legal folder, an illegal mail watch, unlawful medical indifference, conspiracy, or violation of 42 U.S.C. §§ 1985 and 1986, and has failed to even sufficiently allege a claim under section 1981 or for a common law tort.

For all of the foregoing reasons, I conclude that plaintiff's complaint should be dismissed as a matter of law. Accordingly, it is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 44) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.